ASSOCIATED GENERAL CONTRACTORS OF CALIFORNIA, a Nonprofit Corporation, Engineering Contractors Association, a Nonprofit Corporation, American Subcontractors Association, a Nonprofit Corporation, Los Angeles County Chapter, National Electrical Contractors Association, Inc., a Nonprofit Corporation, Steve P. Rados, Inc., a corporation, Griffith Company, a corporation, Gordon H. Ball, Inc., a corporation, Stoddard Enterprises, a Sole Proprietorship, and Granite Construction Company, a corporation, Plaintiffs,

v.

SECRETARY OF COMMERCE OF the UNITED STATES DEPARTMENT OF COMMERCE, U. S. Department of Commerce, Los Angeles County, a Body Corporate and Politic, Los Angeles County Board of Supervisors, Los Angeles Flood Control District, Los Angeles County Engineer, Facilities Department of Los Angeles County, City of Los Angeles, a Municipal Corporation, Los Angeles City Council, Department of Recreation and Parks of the City of Los Angeles, Department of Public Works of the City of Los Angeles, Defendants,

Charles Armistead, Marion Hill, Leo Webb, Rudolpho A. Trujillo, Harold W.

Johnson, American Ass'n of Spanish Speaking Certified Public Accountants, Black Businessmen's Ass'n of Los Angeles, and NAACP, Intervenors.

No. 77-3738-AAH.

United States District Court,
C. D. California.

Oct. 20, 1978.

John H. Findley, Pacific Legal Foundation, Lawrence H. Kay, Associated Gen. Contractors of Cal., Sacramento, Cal., for plaintiffs.

Peter H. Kane, Asst. U. S. Atty., Los Angeles, Cal., and Deborah P. M. Seymour, Trial Atty., Employment Sec., Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C., for federal defendants, Secretary of Commerce of U. S. and Dept. of Commerce.

Charles Moore, Deputy County Counsel, Los Angeles, Cal., for county defendants, Los Angeles County, Los Angeles County Bd. of Sup'rs, Los Angeles Flood Control Dist., Los Angeles County Engineer and the Facilities Dept. of Los Angeles County.

John F. Haggerty, Asst. City Atty., Los Angeles, Cal., for city defendants, City of Los Angeles, Los Angeles City Council, Dept. of Recreation and Parks of City of Los Angeles and Dept. of Public Works of City of Los Angeles.

Charles B. Johnson, Pasadena, Cal., for intervenors, Charles Armistead, Marion Hill, Leo Webb, Rudolpho A. Trujillo, Harold W. Johnson, American Ass'n of Spanish Speaking Certified Public Accountants, and Black Businessmen's Ass'n of Los Angeles.

Hairston, Webster & Johnson by John H. Sandoz, Los Angeles, Cal., for intervenor, NAACP.

## MEMORANDUM OPINION AND ORDER THAT CAUSE IS NOT MOOT (After Hearing per Order of U. S. Supreme Court)

HAUK, District Judge.

### I. INTRODUCTION

Following this Court's ruling, given orally on October 31, 1977, and by way of written opinion dated November 2, 1977, that the 10% minority business enterprises provision of the Public Works Employment Act, as amended, 42 U.S.C. § 6705(f)(2), violated both the constitutional safeguard of equal protection, U.S.Const. amends. V and XIV, and Title VI of the Civil Rights Act, as amended, 42 U.S.C. § 2000d and § 2000d–1,[1] all parties appealed directly to the United States Supreme Court under the provisions of 28 U.S.C. § 1252.[2] On July 3, 1978, the Supreme Court upon consideration of the

---

1. 441 F.Supp. 955 (C.D.Cal.1977). The Court granted both declaratory and injunctive relief to the plaintiffs. *Id.* at 1044.

2. Section 1252 provides as follows:
 § 1252. **Direct appeals from decisions invalidating Acts of Congress**
 Any party may appeal to the Supreme Court from an interlocutory or final judgment, decree

or order of any court of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam and the District Court of the Virgin Islands and any court of record of Puerto Rico, holding an Act of Congress unconstitutional in any civil action, suit, or proceeding to which the United States or any of its agencies, or any officer or employ-

three separate appeals ordered the judgment of this Court vacated and further ordered the cause remanded to this Court "to consider the question of mootness."[3]

At a hearing held on August 21, 1978, this Court filed and·spread the order of the Supreme Court and read said Order, in its entirety, into the record. At that time, the Court issued a briefing schedule to the parties in order to facilitate the consideration by this Court of the mootness question.[4] The parties have now, in accordance with the briefing schedule, fully briefed the is-

> ee thereof, as such officer or employee, is a party.
>
> A party who has received notice of appeal under this section shall take any subsequent appeal or cross appeal to the Supreme Court. All appeals or cross appeals taken to other courts prior to such notice shall be treated as taken directly to the Supreme Court. June 25, 1948, c. 646, 62 Stat. 928; Oct. 31, 1951, c. 655, § 47, 65 Stat. 726; July 7, 1958, Pub.L. 85–508, § 12(e), (f), 72 Stat. 348; Mar. 18, 1959, Pub.L. 86–3, § 14(a), 73 Stat. 10.

**3.** The Order of the Supreme Court provided, in full, as follows:

SUPREME COURT OF THE
UNITED STATES
Nos. 77–1067, 77–1078 and
77–1271

Los Angeles County et al.,
 Appellants,
 v.
Associated General Contractors of California, et al.;
Associated General Contractors of California et al.,
 Appellants,
 v.
Juanita M. Kreps, Secretary of Commerce et al.; and
Juanita M. Kreps,
 Appellant,
 v.
Associated General Contractors of California et al.

APPEALS from the United States District Court for the Central District of California.

THESE CAUSES having been submitted on the statements of jurisdiction and motions to affirm,

ON CONSIDERATION WHEREOF, it is ordered and adjudged by this Court that the judgment of the United States District Court in these cases is vacated; and that these causes are remanded to the United States District

sues involved regarding the question of mootness. The defendants basically argue that because the Secretary of Commerce has already granted all of the funds allocated and appropriated under the Act, this Court's declaratory judgment and injunction no longer present a viable case or controversy. While apparently agreeing with the facts of the defendants' assertions, the plaintiffs argue that various aspects of the mootness doctrine compel a finding that the case is not moot. In addition, certain parties have renewed motions to intervene, which are opposed by the plaintiffs.

Court for the Central District of California to consider the question of mootness.
 July 3, 1978
—— U.S. ——, 98 S.Ct. 3132, 57 L.Ed.2d 1153 (1978).

The federal defendants initially raised the possibility of mootness in their jurisdictional statements before the Supreme Court and repeated the suggestion of mootness in another memorandum before that Court. Jurisdictional Statement in No. 77–1271 (filed March 13, 1978), at 6–8; Memorandum for the Secretary of Commerce in Nos. 77–1067 and 77–1078 (filed March 23, 1978), at 2–3.

**4.** The Court established this briefing schedule by way of an Order to Show Cause, which provided in full as follows:

> Pursuant to the order of the Supreme Court entered therein on July 3, 1978, —— U.S. ——, 98 S.Ct. 3132, 3133, 57 L.Ed.2d 1153, Nos. 77–1067, 77–1078 and 77–1271, this Court herewith files and spreads the mandate thereof, and must now consider the question of whether the issues raised in this action are moot. Accordingly, it is hereby ordered that both plaintiffs and defendants show cause upon this question of mootness by the following procedure:
> 1. Both sides shall serve and file all initial memoranda, points and authorities, affidavits, and all other pleadings desired by them on or before September 11, 1978.
> 2. Both sides shall serve and file any and all memoranda, points and authorities, affidavits, and other pleadings they desire to submit in opposition to said initial filings on or before October 9, 1978.
> 3. Both sides shall be present for an oral hearing on the question of mootness on October 16, 1978, at 10:00 a. m.
>
> Counsel for the parties who had moved this Court for intervention may renew their respective motions for intervention and are also invited to file pleadings in accordance with the above schedule.

After full consideration and review of all the briefs, other pleadings, and affidavits submitted and filed by all of the parties, and the arguments thereon at the hearing held on this question of mootness on October 16, 1978, this Court finds and concludes that: (1) the motions to intervene should be granted, but limited to participation on the question of mootness and in any future proceedings; (2) the case is not moot; (3) the motions to dismiss are denied; and (4) the judgment of this Court is reinstated in full.

## II. MOTIONS TO INTERVENE

After the Court issued its "Summary Judgment for Declaratory and Injunctive Relief" in this case on November 2, 1977, Charles Armistead, Marion Hill, and other individuals and organizations, hereinafter referred to collectively as the Armistead-Hill group, and the Los Angeles Chapter of the National Association for the Advancement of Colored People, hereinafter referred to as the NAACP, filed separate motions for leave to intervene in the case.[5] Before the regularly scheduled hearing on these two motions,[6] all the original parties to the case filed their notices of appeal to the United States Supreme Court.[7] At a hearing held on December 12, 1977, the Court denied these motions to intervene for two reasons. First, once the original parties had filed their notices of appeal to the United States Supreme Court, this Court lacked jurisdiction to entertain the motions for intervention. Second, even if the Court had had jurisdiction to entertain the motions, the parties had not brought the motions in a timely fashion as required by rule 24 of the Federal Rules of Civil Procedure. See 77 F.R.D. 31 (C.D.Cal.1977). The Court also recommended that the applicants for

intervention seek leave to participate in the appeals pending before the Supreme Court as amicus curiae. *Id.* at 36 n. 6. The applicants for intervention filed separate notices of appeal to the Court of Appeals for the Ninth Circuit from this decision; but on August 28, 1978, the Court of Appeals dismissed the appeal of the Armistead-Hill group. for failing to perfect the record on appeal.[8]

Following the remand of this action to this Court by the Supreme Court on July 3, 1978, this Court, as stated above, issued an "Order To Show Cause Re Question Of Mootness As Per Order Of United States Supreme Court" on August 21, 1978. After establishing the briefing schedule on the question of mootness, this Order invited the parties who had earlier sought intervention to renew their motions for intervention and to file pleadings on the mootness question in accordance with the briefing schedule.[9] As suggested in the Court's Order, the parties who had earlier sought leave to intervene—the Armistead-Hill group and the NAACP—have, in addition to filing briefs on the mootness question, renewed their motions to intervene. The plaintiffs oppose the motions; the original defendants have all remained silent with respect to the motions.

### A. Requirements of Rule 24

Both the Armistead-Hill motion and the NAACP motion seek intervention of right, or alternatively, permissive intervention. The plaintiffs contend that neither theory justifies intervention here.

Under rule 24 of the Federal Rules of Civil Procedure, a party is entitled to intervention of right upon a timely application

5. The Armistead-Hill group moved to intervene on November 14, 1977; the NAACP moved to intervene on November 25, 1977.

6. The hearing on both motions were regularly set for hearing on December 12, 1977, under this Court's 17-day rule. Local Rule 3(e).

7. The city defendants filed their notice of appeal on December 1, 1977; the county defend-

ants, federal government defendants, and the plaintiffs all filed their notices of appeal on December 2, 1977.

8. The Court has not yet filed and spread the mandate of the Court of Appeals in this matter.

9. *See* note 4 *supra.*

. . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a)(2). In this case, the applicants for intervention, who are either minority contractors or associations representing minority contractors, obviously have an interest relating to the subject matter of the action. Furthermore, the disposition of this action obviously might impair or impede their ability to protect that interest. The plaintiffs do not seriously challenge the motions on these grounds. Thus, the proposed intervenors meet two parts of the test for intervention of right under rule 24(a)(2). Two other parts of that test remain, however: (1) do the present defendants adequately represent the interests of the applicants? and (2) are the motions timely?

### B. Adequacy of Representation

In attempting to demonstrate that the original defendants did not adequately represent the interests of the minority contractors, the NAACP argues that it could present defenses to the action not raised by the original defendants and that it has been left to the NAACP and other applicants for intervention "to play the role of the true adversary, clearly demonstrating the inadequately [*sic*] of the representation by the present defendants."[10] Specifically, the NAACP criticizes the federal and local defendants for, *inter alia,* failing to substantiate the alleged history of discrimination against minority contractors, failing to demonstrate that no less intrusive alterna-

tive exists to the 10% race quota provision found in the PWE Act, and for failing to file motions for review of the summary judgment issued by this Court. In addition, the NAACP alleges that the government has a conflict of interest in that it allegedly is interested in distributing the funds in question without sufficient regard to seeing that minority contractors obtain their rightful percentage of those funds.[11] The Armistead-Hill motion contains similar arguments.[12]

The plaintiffs contend, on the other hand, that the Court should assume, absent a compelling showing to the contrary, that the government adequately represents the "public interest" here.[13] But while the various governmental defendants may indeed represent the overall public interest, these defendants may not necessarily represent the interests of the applicants for intervention, just as these defendants, while representing the "public interest" do not represent necessarily the interests of the plaintiffs.

Since the Court must, under rule 24, resolve any doubts on this question of adequacy of representation in favor of permitting intervention, see 7A C. Wright & A. Miller, Federal Practice and Procedure, § 1909, at 520–22 (1972), the Court finds, in the circumstances of this case, that the original defendants do not adequately represent the applicants for intervention.

### C. Timeliness of the Motions

As discussed above, the Court found, on ruling on the earlier motions to intervene, that, in addition to lacking jurisdiction to grant the motions, the applicants for intervention had not filed their motions in a timely fashion as required by rule 24(a).

---

**10.** NAACP Motion To Intervene As A Defendant, at 4–6 (filed September 11, 1978).

**11.** NAACP Motion To Intervene As A Defendant, at 4–6 (filed September 11, 1978); NAACP Memorandum of Points and Authorities In Support of Motion For Leave To Intervene, at 6 (filed September 11, 1978).

**12.** Armistead-Hill Notice of Motion and Motion To Intervene, at 4, 5 (filed September 12, 1978). *See also* Affidavits of Charles Armistead and Marion Hill (filed with motion on September 12, 1978).

**13.** Plaintiff's Opposition to Motion of N.A.A.C.P. To Intervene, at 2 (filed September 21, 1978).

See 77 F.R.D. at 36–39. The plaintiffs again contend here that the motions remain untimely, essentially for the same reasons expressed in the Court's earlier opinion.

In a case decided subsequent to this Court's earlier decision on the prior motions to intervene, the Court of Appeals for the Ninth Circuit listed three factors to be weighed in determining whether a motion to intervene is timely: (1) the stage of the proceeding; (2) the possibility of prejudice to the other parties; and (3) the reason for and the length of the delay. *Alaniz v. Tillie Lewis Foods,* 572 F.2d 657, 659 (9th Cir. 1978) (per curiam). In addition, the Court of Appeals, in the *Alaniz* case, reiterated the views expressed in this Court's earlier opinion that the question of timeliness in this context lies in the sound discretion of the district court and that the question of timeliness should be handled more liberally in the context of a motion for intervention of right. *Compare* 572 F.2d at 659 *with* 77 F.R.D. at 36–37.

Another decision of the Ninth Circuit, set as it is in a closely analogous procedural context, is also particularly relevant. In *Johnson v. San Francisco Unified School District,* 500 F.2d 349 (9th Cir. 1975) (per curiam), the district court had found a motion to intervene untimely. After vacating and remanding the case to the district court for rehearing of the merits of the case, the Court of Appeals, while suggesting that it would have ordinarily affirmed the district court's order on the motion to intervene, instructed the district court to permit the moving parties to intervene following the remand. In this case, of course, as in the *Johnson* case, an appellate court has remanded this action and parties have sought intervention.

After considering the factors listed in the *Alaniz* case, the liberality with which the timeliness question is considered in the context of motions for intervention of right, the *Johnson* case, and the Court's ability to impose conditions on intervenors in order to promote the efficient conduct of litigation,[14] the Court hereby grants the motions to intervene but limits that intervention to participation in future proceedings in this case. This means that the intervenors' proposed answers, lodged with the Court in compliance with the requirements of rule 24(c),[15] will not be filed and will remain only lodged, but that the intervenors are able to file and in fact have actually filed their briefs on the mootness question now before the Court and may participate in any future appeals. This resolution of the motions serves to avoid any prejudice to the plaintiffs, prevents relitigation of issues already decided, and reminds the intervenors of the need for prompt intervention in this type of case.

Thus, the Court hereby finds that the applicants for intervention do satisfy the requirements of rule 24 and orders the motions to intervene granted, but further orders that the intervenors' participation be limited to participation in the instant and any future proceedings in this case.

## III. MOOTNESS

Under Article III of the United States Constitution, a federal court may only hear cases involving actual cases or controversies and may not hear moot cases. *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975); *DeFunis v. Odegaard,* 416 U.S. 312, 316, 94 S.Ct. 1704, 40 L.Ed.2d

14. The Advisory Committee Note to rule 24 provides as follows:

> An intervention of right . . . may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings.

See also *McDonald v. E. J. Lavino Co.,* 430 F.2d 1065, 1073 n.7 (5th Cir. 1970); *Ionian Shipping Co. v. British Law Ins. Co.,* 426 F.2d 186, 191–92 (2d Cir. 1970); *Smuck v. Hobson,* 132 U.S.

App.D.C. 372, 376–77, 408 F.2d 175, 179–80 (1969).

15. In pertinent part, rule 24(c) provides that a motion for intervention "shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought." In this case, both the Armistead-Hill group and the NAACP submitted proposed answers to the plaintiff's original complaint, but did not seek any postjudgment relief.

164 (1974) (per curiam); *Steffel v. Thompson,* 415 U.S. 452, 458–60, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971). *See also White v. Regester,* 422 U.S. 935, 95 S.Ct. 2670, 45 L.Ed.2d 662 (1975) (per curiam); *Sosna v. Iowa,* 419 U.S. 393, 402 n.12, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). The determination of whether a case is moot, however, is often extremely difficult. *See* C. Wright, Handbook of the Law of Federal Courts, § 12, at 39 (3d ed. 1976). The instant case presents an example of how difficult the question of mootness can become.

On the one hand, the defendants and intervenors argue that the injunction issued by this Court on November 2, 1977, did not apply to federal funds "heretofore granted"; that the entire $6 billion allocated and appropriated by Congress had been and has been "granted" to local grantees; and that, therefore, the Court's ruling does not have any current practical effect. Accordingly, the defendants and intervenors argue, the case is moot and any opinion by this Court would be an unconstitutional advisory opinion. On the other hand, the plaintiffs, while conceding many of the defendants' facts, argue that various aspects of the law dealing with mootness demonstrate that the case is not moot. After considering all the arguments of the parties, the Court finds that the plaintiffs' arguments with respect to mootness are convincing, as the following subsections of this opinion will demonstrate.

## A. "CAPABLE OF REPETITION, YET EVADING REVIEW" DOCTRINE

■ A long, established line of Supreme Court decisions holds that an otherwise moot case is not moot if it is "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. I.C.C.,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 546–47, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975); *Sosna v. Iowa,* 419 U.S. 393, 398–400, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975);

*DeFunis v. Odegaard,* 416 U.S. 312, 318–19, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (per curiam); *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 121–22, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Dunn v. Blumstein,* 405 U.S. 330, 333 n.2, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Carroll v. President & Comm'rs of Princess Anne,* 393 U.S. 175, 178–79, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968). *See also Williams v. Alioto,* 549 F.2d 136, 142 (9th Cir. 1977); *Knuckles v. Weinberger,* 511 F.2d 1221, 1222 (9th Cir. 1975); C. Wright, Handbook of the Law of Federal Courts, § 12, at 39–40 (3d ed. 1976); Note, Mootness on Appeal in the Supreme Court, 83 Harv.L.Rev. 1672, 1685–87 (1970).

As the Supreme Court has interpreted this doctrine, two separate inquiries must be made. First, the Court must inquire whether the situation presented in the case is capable of repetition. Second, the Court must inquire whether the case will likely evade review. *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 546–47, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Williams v. Alioto,* 549 F.2d 136, 145 (9th Cir. 1977). Thus, this Court's duty is to inquire as to the presence of both parts of this two-pronged test, as the Courts have interpreted them, in the light of the facts of the instant case.

### 1. *"Capable of repetition"*

In determining whether a case involves action that is "capable of repetition," the Supreme Court has faced a variety of procedural and factual situations. In *Carroll v. President & Comm'rs of Princess Anne,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968), for example, the Court decided to review, over objections of mootness, the merits of a trial court's issuance of a 10-day temporary restraining order after the 10-day period of the order had passed, finding that the underlying question involved in the case— whether the order infringed on first amendment rights—persisted. Similarly, in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Court found that a woman

could press her challenge to a state antiabortion statute despite the fact that she was no longer pregnant by holding that the action was capable of repetition. In *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (per curiam), the Court ruled that a law student, already registered for his final year of studies, suing only for a mandatory injunction compelling his admission into law school did not have a case capable of repetition because he would never again confront the admissions policies of the law school in which he was already registered.

The most recent Supreme Court decision dealing with the "capable of repetition" question is *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). In that case, a trial judge in a state murder prosecution has issued a gag order temporarily restraining pretrial publicity of the case; by its own terms, the order expired at the time the court empanelled a jury. The defendant appealed the question of whether the order violated the first amendment and the Nebraska Supreme Court modified the order and remanded the case back to the trial court. The defendant appealed and the Supreme Court then accepted certiorari in the case, but denied an application for a stay of the state court proceedings, thus permitting the case to go to trial. By the time the Supreme Court decided the merits of the appeal, the defendant had been convicted in the murder trial and sentenced to death and had an appeal from the conviction pending in the state courts of Nebraska. The Supreme Court opinion, before reaching the first amendment issues involved, thus had to consider whether the appeal from an already expired order was moot. Applying the "capable of repetition, yet evading review" doctrine, the Court found that the case was not moot. Specifically, the Court found that the case was "capable of repetition" because: (1) "if" the Nebraska Supreme Court reversed the conviction and ordered a new trial, the trial court "may" enter another gag order; and (2) state law authorized Nebraska prosecutors to seek such orders in appropriate cases and could

do so again. 427 U.S. at 546–47, 96 S.Ct. 2791.

■ While the Supreme Court's application of this "capable of repetition" issue is not always precisely clear, *see* C. Wright, Handbook of the Law of Federal Courts, § 12, at 39 (3d ed. 1976), the *Nebraska Press Ass'n v. Stuart* decision, the Supreme Court's most recent analysis of this issue, does make clear that in order to be "capable of repetition" in this context, a problem need not be certain to recur. Rather, the test is whether a reasonable expectation of recurrence of the problem exists. *See Williams v. Alioto,* 549 F.2d 136, 143 n.8 (9th Cir. 1977) ("The focus is on whether the same issues, arising from a repetition of a similar law or action, are likely to recur."); *Knuckles v. Weinberger,* 511 F.2d 1221, 1222 (9th Cir. 1975).

In this case, the plaintiffs argued that the problem presented here is capable of repetition because Congress was considering several modified plans to authorize further federal funding for local public works construction projects which include minority business enterprise provisions similar to that found unconstitutional by this Court. The defendants and intervenors, however, argued that the proposed bills differ from the statute held unconstitutional by this Court; that the Congress may not pass the bills in question; that the President may veto such bills, if passed; and that, therefore, it is mere speculation that Congress will spend further federal funds by way of an act including a 10% minority business enterprises provision. Accordingly, the defendants and intervenors argued, the requirements of the "capable of repetition, yet evading review" doctrine have not been met.

By the time Congress adjourned on October 15, 1978, one day before the hearing on the question of mootness and after all the parties had filed their briefs on the question of mootness, three bills were introduced in Congress which would have authorized further federal funding for local public works construction projects and included benefits

for minority business enterprises. The first bill, H.R. 11610, initially amounted merely to a $4 billion increase in funds for the Local Public Works Capital Development and Investment Act of 1976, which, as amended, includes the 10% race quota provision. Several Congressmen joined in sponsoring this bill on March 16, 1978, and it was referred to the House Committee on Public Works and Transportation on that date.[16]

On June 6, 1978, several Congressmen introduced a second bill in the House. This bill, H.R. 12993, would have, if passed, enacted the "Labor Intensive Public Works Act of 1978" and would have authorized $1 billion for local construction projects during each of the next three years. Under the terms of H.R. 12993, the grantees and subgrantees of these funds must spend a "prescribed share" of the funds for "minority business enterprises", which are defined in this bill just as they are defined in the PWE Act held unconstitutional by this Court. Rather than allocate a fixed 10% of those funds to MBEs, however, H.R. 12993 provided that this "prescribed share" shall reflect the percentage of minority group members in the community and absolutely fixes the "share" at between 2–15% of the funds, "targeting" 10% of the nationwide funds for minority business enterprises. H.R. 12993, § 1206(d). This bill, like H.R. 11610, was referred to the House Committee on Public Works and Transportation following its introduction.[17]

On June 8, 1978, a like bill, S. 3186, with a 2–15% quota and a 10% minority target, was introduced in the Senate and then referred to the Senate Committee on Environment and Public Works.[18] The Senate Regional and Community Subcommittee of the Senate Committee on Environment and Public Works held hearings on this bill, but took no further action.

The House, however, took some further action on H.R. 11610 before adjournment.

On August 16, 1978, the House Subcommittee on Economic Development reported out a revised version on H.R. 11610. The revised bill would authorize $3 billion for construction projects during each of 1979 and 1980 and would, like H.R. 12993 and S. 3186, adopt the 2–15% minority business enterprise quota provision and the 10% target figure. The full committee did not act on this bill before adjournment.

Thus, this Court must decide whether these bills demonstrate that the problems presented in this litigation are "capable of repetition" as that term has been interpreted by the appellate courts, i. e., is reasonably likely to recur. After a thorough consideration of this question, the Court must find that these bills, despite the change from a rigid 10% quota to a slightly more flexible 2–15% quota with a 10% nationwide "target," do demonstrate that the problems involved in this litigation are "capable of repetition" as the Supreme Court and the Ninth Circuit have interpreted that standard. Congress has not amended or repealed § 6705(f)(2), but rather has demonstrated its intent to distribute again federal funds based on a person's race, and race alone, by way of some sort of race quota provision, to the exclusion of nonminority contractors and without a sufficient finding of prior discrimination. This intent, reflected in the three bills—H.R. 11610, H.R. 12993, and S. 3186—demonstrates that Congress will likely allocate and appropriate further funds using a quota and that the problems presented in this litigation are reasonably likely to recur and, therefore, are "capable of repetition." *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968).

16. 124 Cong. Record H. 2184 (daily ed. March 16, 1978).

17. 124 Cong. Record H. 5062 (daily ed. June 6, 1978).

18. 124 Cong. Record S. 8845 (daily ed. June 8, 1978).

### 2. *"Yet Evading Review"*

In addition to finding that the problem is "capable of repetition," the Court must also find, under the double-pronged test set forth in *Nebraska Press Ass'n v. Stuart*, that the problem will evade review before the Court can rule a case not moot under the double-pronged test of the "capable of repetition, yet evading review" doctrine. Analysis of this element, due to the interpretative gloss put on it by the appellate courts, shows that the problem will evade review.

Both the Supreme Court and the Court of Appeals for the Ninth Circuit have stated that by "review," this element of the test should be interpreted to mean that the case might evade *appellate* review. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 547, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Williams v. Alioto*, 549 F.2d 136, 142 (9th Cir. 1977) ("The case should be within a class normally incapable of appellate review because of the lapse of time"). *See also* 6A Moore's Federal Practice, ¶ 57.13, at 57–133 to 57–136.

In this case, a deliberate and considered appellate review would be impossible, should Congress authorize and appropriate further federal funds for minority business enterprises, due to the speed with which Congress has in the past and will undoubtedly in the future legislate that the funds be spent. Under the Act held unconstitutional by this Court, the Secretary of Commerce had to decide whether each application for funds under the Act was proper within 60 days of her receipt of the application. 42 U.S.C. §§ 6705(d), 6706. In addition, under Round II of the Act, Congress appropriated the authorized $4 billion of the Act on May 13, 1977 and required the Secretary of Commerce to grant those funds by September 30, 1977.[19] Similarly, under the

bills currently under consideration by Congress, the Secretary of Commerce would also have to grant any funds with great speed. Under H.R. 11610, as amended, the Secretary must, just as in Rounds I and II, decide on each application for a grant within 60 days after receipt of the application. H.R. 11610, § 1106(c). Under both S. 3186 and H.R. 12993, an applicant for a grant must submit an application for funds within 90 days of the publication of notice of allocation of funds and the Secretary of Commerce must approve or disapprove of the application within 90 days. S. 3186, § 1205(b)(1); H.R. 12993, § 1205(b)(1). Thus, the speed which Congress has dictated, and will dictate again, to bind the Secretary of Commerce in spending these federal funds will preclude any opportunity for considered appellate review prior to the dates by which the funds will be exhausted. Consequently, under the precedents of *Nebraska Press Ass'n v. Stuart; Roe v. Wade*, and *Williams v. Alioto*, the Court finds that the problems here will likely evade review, as the Supreme Court and the Court of Appeals for the Ninth Circuit have interpreted that latter part of the two-pronged test of the "capable of repetition, yet evading review" doctrine.

### 3. *Conclusion*

■ The Court therefore necessarily must find that the case is both capable of repetition and likely to evade review. Since both prongs of the two-pronged test for this doctrine established by the Supreme Court and the Court of Appeals for the Ninth Circuit have been met, the Court must hold that the case is not moot. The Court also wishes to note that this conclusion, reached as to both the declaratory judgment and the injunction issued by the Court on November 2, 1977, seems particularly appropriate with respect to the declaratory judgment that

---

**19.** Because of the speed with which the funds were to flow under the Act, the official strategy of the Department of Justice in defending the various actions brought against the Act in question was simply to stall litigation for as long as possible in order to keep the funds flowing. Remarks of David Rose, Esq., Chief, Employment Section, U.S. Department of Justice, Civil Rights Division, at Seminar on "Defense of the Public Contract Reverse Discrimination Case," at conference on "Employment Discrimination and the Law" held at the University of Southern California Law Center, January 6, 1978.

the 10% minority business enterprises provision is unconstitutional.

## B. *W. T. GRANT—CONCENTRATED PHOSPHATE* DOCTRINE

The plaintiffs also argue that the case is not moot under the precedents of *United States v. W. T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) and *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968). The doctrine found in these cases, while similar to, is distinct from the "capable of repetition, yet evading review" doctrine. *DeFunis v. Odegaard*, 416 U.S. 312, 318, 94 S.Ct. 1704, 1707, 40 L.Ed.2d 164 (1974) (per curiam).

In *United States v. W. T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), the government brought an action under the Clayton Act alleging that an individual and several corporations had violated the Act's prohibition against interlocking corporate directorates. Soon after the filing of the complaints, the "interlocking" director resigned from the boards of directors of three of the corporations in question and the defendants then moved to dismiss the action against them as moot. The district court granted the motion and the government appealed to the Supreme Court.

On appeal, the Supreme Court ruled that the case was *not* moot, stating:

> . . . voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i. e.*, does not make the case moot. A controversy may remain to be settled in such circumstances, *e. g.*, a dispute over the legality of the challenged practices. The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion. For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right. The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement.

345 U.S. at 632, 73 S.Ct. at 897 (footnotes and citations omitted). The Court also found, however, that a case in a similar situation could be found moot if the defendant were able to bear the "heavy" burden of demonstrating that there is no reasonable expectation that the wrong will be repeated. *Id.* at 633, 73 S.Ct. 894. In addition, the Court found that a district court's power to issue injunctive orders also survives the discontinuance of the allegedly illegal conduct. *Id.* On the facts of the case before it, the Supreme Court found that the defendants' statement that the interlocking no longer existed and their disclaimer of intent to resume such interlocking was insufficient to render the case moot.

In *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968), the government brought an antitrust action regarding the defendants' sales of goods to Korea. The defendants convinced the district court that they were exempt from the antitrust laws, the district court dismissed the action, and the government appealed. After the district court's decision, however, the association defendant dissolved itself after new governmental regulations rendered it uneconomical for it to continue in its business, and then argued on appeal that the case was moot. Reiterating the *W. T. Grant* principles, the Court found the case not moot in the following language:

> The test for mootness in cases such as this is a stringent one. Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave "[t]he defendant . . . free to return to his old ways." A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. But here we have only appellees' own statement that it would be uneconomical for them to engage in any further joint operations. Such a statement, standing alone, cannot suffice to satisfy the heavy burden of persuasion which we

have held rests upon those in appellees' shoes.

393 U.S. at 203, 89 S.Ct. at 364 (citations omitted).[20]

■ In this case, the defendants and intervenors have not carried the "heavy" burden on this "stringent" test of demonstrating mootness for several reasons.

First, the federal defendants have repeatedly clouded the issues involved with the status of the funds under the Act. In support of their earlier motion for summary judgment, the federal defendants submitted an affidavit from the Chief of the Program Analysis Division of the Economic Development Administration of the Department of Commerce. This affidavit suggested that as of September 30, 1977, $2 billion remained to be spent, nationwide, under the Act. Sulvetta Affidavit, Attachment N to the Federal Defendants' Motion for Summary Judgment (filed October 21, 1977).[21] Then, at the oral hearing on the parties' cross-motions for summary judgment, counsel for the Secretary of Commerce, Ms. Deborah P.M. Seymour, in response to questioning by the Court, expressly stated that $2 billion remained.[22] On November 15, 1977, however, Ms. Seymour wrote a letter to the Court indicating her views that all the funds allocated and appropriated by Congress for use under the Act had been granted.[23]

Now, the federal defendants argue that as of September 30, 1977, no funds remained to be spent under the Act and support this argument with affidavits of an Assistant Secretary of Commerce and an attorney for the EDA. The briefs filed by the Secretary of Commerce dealing with the question of mootness, however, do not contain any further affidavit from Sulvetta nor explain in any way the apparently contradictory evidence. Counsel for the Secretary could only state at the oral hearing regarding mootness that the Sulvetta affidavit was "ambiguous." As for counsel's statement to the Court on October 31, 1977, that $2 billion remained, counsel for the Secretary of Commerce wrote to the Court on November 15, 1977, as already noted, supposedly "clarifying" the status of the funds,[24] but without mentioning the Sulvetta affidavit, which was the only evidence before the Court at the time it issued its

---

**20.** In addition to the *W. T. Grant* and *Concentrated Phosphate* cases, the Supreme Court has discussed the "voluntary cessation of allegedly illegal conduct" doctrine established therein on two other occasions. In *DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (per curiam), the Court found the doctrine inapplicable because in that case the University of Washington had not ceased its allegedly unlawful conduct at all; rather, the school had argued that the case was moot because DeFunis had already been admitted and registered for his final year of study. In *Preiser v. Newkirk*, 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975), the Court also found the doctrine inapplicable to a case in which a prisoner sought review of his transfer from a medium security institution to a maximum security institution because the authorities had subsequently transferred him to a minimum security institution and further because the authorities harbored no resentment toward the plaintiff, thus demonstrating to the Court that there was no reasonable expectation that the allegedly unlawful conduct would recur.

**21.** See 441 F.Supp. at 970–71. The Court relied heavily on the Sulvetta affidavit in ruling that its injunctive order should apply prospectively only.

**22.** Transcript of October 31, 1977 hearing, at 130–33. At this point in the hearing, the Court was discussing with the parties whether the injunction should apply retroactively or prospectively. Among her other comments, Ms. Seymour made the following comments:

MS. SEYMOUR: Well, on an injunction only against unappropriated funds, your Honor, there would be an opportunity for review and it would not harm the public.

THE COURT: Of course, because you've got $2 billion more coming up that haven't been appropriated, right?

MS. SEYMOUR: Yes, your Honor.

Transcript at 133, lines 6–12.

It should also be noted, however, that counsel for the plaintiff also thought, apparently, that $2 billion remained to be spent. See Transcript at 155.

**23.** At that time, the Court treated this letter as a motion for reconsideration and, as such, denied it.

**24.** See Reply Memorandum for the Secretary of Commerce on the Question of Mootness (filed October 4, 1978), at 4.

decision. Moreover, the Secretary of Commerce now admits to presenting inaccurate facts before the Supreme Court in arguing mootness there. In both her jurisdictional statement and a subsequent memorandum filed in that Court, the Secretary of Commerce stated that "all the contracts for the 65 projects in the Los Angeles area that were the subject of the appellees' suit have been let in compliance with Section 103(f)(2)."[25] Now, however, after further inquiry prompted by the plaintiffs' challenge to this statement, the Secretary of Commerce admits that this statement to the Supreme Court, which may have in part prompted that Court's Order of remand, was "inadvertently in error."[26] The net result of this conduct of the litigation by the Secretary of Commerce served to foster confusion regarding the status of funds; such confusion does not amount to the carrying successfully of a "heavy" burden.

Second, neither the defendants nor the intervenors have shown any evidence to convince the Court that Congress will not again distribute more funds to contractors solely on the basis of race. Congress has not yet amended or repealed the Act held unconstitutional by this Court and seems intent, as reflected in the three bills discussed in the preceding section, upon continuing to appropriate funds to projects which contain minority business enterprise quotas. None of the defendants can contradict this.

Therefore, for these reasons, and also for the reasons set forth in the preceding section of this opinion, the Court finds that the defendants have not carried their "heavy" burden on the "stringent" test for mootness. All in all, the defendants have failed to convince the Court that their allegedly wrongful conduct is not reasonably likely to recur within the meaning of the *W. T. Grant—Concentrated Phosphate* doctrine.

This case presents a good example of a case in which a finding of mootness would leave the defendants "free to return to [their] old ways." Accordingly, the Court holds that the case is not moot under the doctrine established by the Supreme Court in *United States v. W. T. Grant* and *United States v. Concentrated Phosphate Export Ass'n.*

## C. OTHER RECENT FEDERAL COURT DECISIONS HAVE NOT DISMISSED SIMILAR ACTIONS AS MOOT

Numerous other federal district courts throughout the country have also considered the issues presented by the 10% minority business enterprises provision of the PWE Act. *E. g., Virginia Chapter, Associated General Contractors v. Kreps,* 444 F.Supp. 1167 (W.D.Va.1978); *Wright Farms Construction, Inc. v. Kreps,* 444 F.Supp. 1023 (D.Vt.1977), holding the 10% race quota unconstitutional; *Fullilove v. Kreps,* 443 F.Supp. 253 (S.D.N.Y.1977); *Carolinas Branch, Associated General Contractors v. Kreps,* 442 F.Supp. 392 (D.S.C. 1977); *Constructors' Ass'n v. Kreps,* 441 F.Supp. 936 (W.D.Pa.1977); *Montana Contractors' Ass'n v. Kreps,* 439 F.Supp. 1331 (D.Mont.1977).[27]

In addition, and more importantly, three recent decisions of separate Courts of Appeals for different Circuits, while essentially reaching a different conclusion than that reached by this Court with respect to the constitutionality of the 10% race quota provision, have recently ruled on the same issues presented in this action, without any hint or suggestion that the actions are moot. On March 7, 1978, the Court of Appeals for the Third Circuit held that the district court did not abuse its discretion in declining to issue a preliminary injunction against enforcement of the 10% provision. *Constructors' Ass'n v. Kreps,* 573 F.2d 811

---

**25.** Jurisdictional Statement in No. 77–1271 (filed March 13, 1978), at 6; Memorandum for the Secretary of Commerce in Nos. 77–1067 and 77–1078 (filed March 23, 1978), at 2.

**26.** Reply Memorandum for the Secretary of Commerce on the Question of Mootness (filed October 4, 1978), at 4.

**27.** *See also Virginia Chapter, Associated General Contractors v. Kreps,* 444 F.Supp. 1167, 1176–77 (W.D.Va.1978); *Wright Farms Construction, Inc. v. Kreps,* 444 F.Supp. 1023, 1029 nn. 8 & 10 (D.Vt.1977); *Fullilove v. Kreps,* 443 F.Supp. 253, 255 n. 3 (S.D.N.Y.1977) (all citing other cases).

(3d Cir. 1978). On July 7, 1978, the Court of Appeals for the Sixth Circuit also upheld the constitutionality of the 10% MBE provision. *Ohio Contractors' Ass'n v. EDA*, 580 F.2d 213 (6th Cir. 1978). And on September 22, 1978, the Court of Appeals for the Second Circuit reached the same conclusion. *Fullilove v. Kreps*, 584 F.2d 600 (2d Cir. 1978).

While disagreeing with these decisions on the merits of their respective conclusions, the Court notes that none of these three recent appellate decisions found the questions involved in those cases to be moot. Most significantly, the decision of the Second Circuit in *Fullilove v. Kreps* recognizes that the Supreme Court remanded our instant case for consideration of the question of mootness, 584 F.2d at 608, but does not discuss the question of mootness at all in its opinion. While the posture of these appeals differs somewhat from the posture of this case, these respected Courts would certainly have recognized that the cases before them were moot if, as the defendants and intervenors argue here, no case or controversy exists. If these Courts had been faced with a situation in which no case or controversy exists, then those Courts would not and could not have decided those cases. But because these Courts, as recently as one month ago decided the issues presented by the 10% quota provision on the merits, it is apparent that they support this Court's conclusion that the instant case is not moot. And it is specially intriguing to note that apparently in none of these cases did any of the defendants, including the federal defendant in our case, make any argument that the cases were moot!

## IV. MERITS OF THE UNDERLYING CONTROVERSY IN THE WAKE OF THE *BAKKE* DECISION

 Counsel for the Armistead-Hill group of intervenors suggested, in his initial

brief re mootness, that the Supreme Court's decision in *Regents of the University of California v. Bakke*, —— U.S. ——, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), does not invalidate the minority business enterprises provision of 42 U.S.C. § 6705(f)(2).[28] The Court feels to the contrary, however, and believes that language from the majority opinion of Mr. Justice Powell in *Bakke* supports this Court's view that while affirmative action is permissible, racial quotas[29] are impermissible and unconstitutional. In section III, A of his opinion, Mr. Justice Powell, joined by Chief Justice Burger and Justices White, Stewart, Rehnquist, and Stevens, wrote:

> The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color. If both are not accorded the same protection, then it is not equal.

—— U.S. at ——, 98 S.Ct. at 2748. Similarly, in section IV, A of his opinion, Mr. Justice Powell, joined by Chief Justice Burger and Justices Stewart, Rehnquist, and Stevens, wrote:

> Preferring members of any one group for no reason other than race or ethnic origin is discriminatory for its own sake. This the Constitution forbids.

—— U.S. at ——, 98 S.Ct. at 2757.

Moreover, the Supreme Court held in *Bakke* that legislative classifications based on race, even so-called "benign" classifications designed to benefit minority group members, are subject to strict judicial scrutiny and that, in order to be found constitutional, the Court must find that the legislature used "necessary" means to promote a legitimate, substantial interest. In this case, however, this Court has previously found, and continues to believe that means

---

**28.** Intervenors' Brief, at 5–10 (filed September 12, 1978). *See also* Memorandum for the Secretary of Commerce on the Question of Mootness, at 2 n. 1 (filed September 11, 1978).

**29.** The *Bakke* opinion discusses the meaning of the word "quota" as opposed to the term

"goal" and ultimately concludes that the semantic distinction, at least in that case, is meaningless: "Whether this limitation is described as a quota or a goal, it is a line drawn on the basis of race and ethnic status." —— U.S. at ——, 98 S.Ct. at 2748.

of promoting employment of minority group contractors less intrusive than the 10% racial quota enacted by Congress existed. As pointed out in the Court's original decision, the MBE provision does not limit itself to businesses which have previously experienced a prescribed level of income or unemployment. In addition, Congress has never demonstrated that affirmative action plans in this industry are not feasible. Furthermore, the 2–15% MBE provision in the most recent bills introduced in Congress, while still maintaining a quota system, may indeed be less intrusive than the original strict 10% quota system. Thus, in the wake of *Bakke*, the Court reiterates its views that the 10% race quota was not a constitutionally acceptable means of promoting the Congress' legitimate interest in promoting employment in the construction industry among minority group members.

United States District Court,
S. D. Florida.