Joseph B. **WILLIAMS** and Leo Bazille et al., Plaintiffs-Appellees,

v.

Joseph L. **ALIOTO** et al., Defendants-Appellants.

No. 74-2149.

United States Court of Appeals, Ninth Circuit.

Jan. 25, 1977.

George P. Agnost, Deputy City Atty. (argued), San Francisco, Cal., for defendants-appellants.

Jerome B. Falk, Jr. (argued), San Francisco, Cal., for plaintiffs-appellees.

Before TRASK and GOODWIN, Circuit Judges, and BOHANON,* District Judge.

TRASK, Circuit Judge:

This is an appeal from an order of the district court of the Northern District of California that preliminarily enjoined officials of the San Francisco Police Department from continuing certain practices of "Operation Zebra," a program involving the stopping, frisking, and questioning of black males who resembled an unapprehended murderer. Jurisdiction to hear this appeal is based upon 28 U.S.C. §§ 1291, 1292(a)(1). Because there is no longer a case or controversy under Article III of the Constitution, we dismiss the appeal as moot and vacate the judgment of the district court.

## I.

Between December 1973 and April 1974, a series of unsolved murders and attempted murders terrorized the City of San Francisco. All 17 victims were white; witnesses and surviving victims described the assailant or assailants as black, male, and 20 to 30 years of age. No apparent motive existed for the shootings, which occurred during the evening hours at various locations in the City.[1] According to the statements of some city officials, tensions were developing that created a danger of racial conflict and violence.

The San Francisco Police Department initiated a special investigation of the crimes, assigning the letter "Z" and the code name "Zebra" to the shootings. Because of the failure of traditional, although intensified, law enforcement techniques to apprehend the murderer, the Department decided to implement a saturation campaign designed to identify and capture the killer. On April 17, 1974, Captain Taylor issued an intradepartmental memorandum describing the nature of "Operation Zebra." All officers on patrol were authorized to "stop those persons who fit the description of the suspects, making a pat search of their person for possible weapons, [after which] a Field Interrogation Card shall be completed." Plaintiffs' Exhibit No. 1. The description or "profile" consisted of two parts. First, two composite sketches of the suspect prepared from eyewitness descriptions were included in the profile. Second, Taylor's directive supplemented these drawings with a general description of the "Zebra killer" and his *modus operandi*:

"These murders have been committed by:
One or two Black males
20 to 30 years old
5 foot 8 to 6 foot
Slender to medium build
On foot or in a passenger vehicle
Armed with a 32 ca. automatic between the hours of 2000 to 2300." *Id.*

The directive did not indicate that the officers were expected to consider a person's behavior as a factor in deciding whether to stop him.

During the period from April 18, 1974, to April 23, 1974, police officials issued several more directives relating to Operation Zebra. An April 18 verbal order by Captain Barca to a special Operation Zebra detail and two written orders from Police Chief Scott, dated April 19 and April 22, created some confusion over whether the Operation Zebra frisks were mandatory or discretionary. All three orders indicated that stops could continue being made on the sole basis of resemblance to the profile, however. An April 23 memorandum from Barca to the special Zebra Command stated:

"From now on, be more selective when making stops. Make them when the individual [not only resembles the profile but]

---

* The Honorable Luther Bohanon, Senior United States District Judge for the Northern, Western and Eastern District of Oklahoma, sitting by designation.

1. For convenience, this opinion generally will discuss the murderer or murderers in the singular. During the investigation, law enforcement officials did not know how many people were responsible for the shootings. At times, police officials referred to one killer, but on other occasions they discussed several assailants. On March 29, 1976, four persons were convicted of these crimes after a jury trial in the Superior Court of the County of San Francisco, California. *People v. Moore*, No. 88244 (Super. Ct.Cal.1976).

is acting, or appears to be, out of the ordinary." Plaintiffs' Exhibit No. 7. No evidence indicates that this directive applied to ordinary patrol officers, a much larger group.

On April 25, 1974, Chief Scott issued another order, the "Revised Zebra Guidelines," directed to the entire Police Department and superseding prior oral and written instructions. With some additions, the revised guidelines, like earlier memoranda, contained a list of the suspect's physical characteristics and *modus operandi,* and referred officers to the composite drawings of the killer. The guidelines also contained detailed provisions regulating the nature of contacts, stops, police conduct during stops, frisks, and frisk procedures. In its section on stops, the guidelines provided a "list [containing] . . . some factors which—alone or in combination—may be sufficient to establish 'reasonable suspicion' for a stop." Defendants' Exhibit E at 3 (emphasis in original). These factors included, *inter alia,* the suspect's appearance ("Does he generally fit the description of the person wanted for the particular offense being investigated?"), the time of day and area of the stop, the officer's prior knowledge and source of information about the suspect, and the suspect's pattern of conduct ("Does the person's conduct resemble the pattern of conduct or *modus operandi* followed in the Zebra assaults?"). *Id.* at 3–4. The guidelines cautioned that an officer could make a stop only on the basis of specific, articulable facts which justified him in believing that a crime had been committed by the person stopped.[2]

The guidelines stated that frisks were discretionary: "A law enforcement officer may frisk any person whom he has stopped when the officer reasonably suspects that the person is carrying a concealed weapon or dangerous instrument and that a frisk is necessary to protect himself or others." Defendants' Exhibit E at 5–6. Factors which alone or in combination justified a frisk included the person's appearance ("Do his clothes bulge in a manner suggesting the presence of an object capable of inflicting injury?"), his actions, the officer's prior knowledge about the suspect, and the time of day and location of the stop. *Id.* at 6. The guidelines did not indicate that a frisk could be made on the sole basis of the suspect's resemblance to the composite drawings.

On April 19, 1974, and April 22, 1974, several days before the issuance of the revised guidelines, plaintiffs brought class actions seeking declaratory and injunctive relief from alleged Fourth Amendment violations of the Zebra program. They brought the actions on behalf of all black males who were stopped or subject to being stopped pursuant to the directives. For purposes of an evidentiary hearing and a ruling on the motions for declaratory and injunctive relief, the court consolidated the cases.

On April 25, 1974, shortly after the promulgation of the revised guidelines, the district court ended its evidentiary hearing, entered its findings of fact and conclusions of law, and issued a preliminary injunction. In its findings of fact, the court stated that the directives and memoranda issued between April 17, 1974, and April 22, 1974, were similar in their authorization "that officers stop black male individuals physically resembling two composite drawings

---

**2.** In pertinent part, the guidelines stated:

"*Basis for a Stop.* If an officer reasonably suspects that a person has committed, is committing, or is about to commit any crime, he has the authority to stop that person. He may exercise this authority in any place that he has a right to be. Both pedestrians and persons in vehicles may be stopped.

"*Reasonable Suspicion.* The term 'reasonable suspicion' is not capable of precise definition; it is more than a hunch or mere speculation on the part of an officer, but less than the probable cause necessary for arrest. It may arise out of a contact, or it may exist prior to or independently of a contact. Reasonable suspicion has been defined as a combination of specific and articulable facts, together with reasonable inferences from those facts, which in light of the officer's experience, reasonably justify believing that the person to be stopped had committed, was committing, or was about to commit a crime."

. . . and having other general physical characteristics [described in the directives], although such individuals exhibited no other characteristics or activities that could lead a reasonable officer to believe that the particular individual had engaged in or was presently engaging in criminal activity." C.T. at 91–92.[3] As to the April 25 revised guidelines, the court found that, despite their detailed provisions regulating stopping and frisking, they continued to "authorize a forcible stop on no more than a determination that the subject 'fit[s] the description of the persons wanted' for the Zebra slayings. . . ." C.T. at 93. The court also observed that in the eight day period from April 17 to April 25, over 600 black males were stopped pursuant to Operation Zebra.

The court concluded that "[t]he forcible stoppings of individuals [pursuant to both the original Zebra directives and their successive modifications] upon the ground of resemblance to the suspect . . . and portrayed in the composite drawings . . . without additional reliable evidence which, judged objectively, presents sufficient indicia of reliability to warrant a reasonable police officer in concluding that the particular individual stopped has committed or is committing a criminal offense, violates the Fourth and Fourteenth Amendments to the Constitution of the United States." C.T. at 95. It also held that the revised guidelines of April 25, "to the extent that they continue to authorize and direct the forcible stop of large numbers of black male persons who fit the general description contained therein and in the aforesaid composite drawings without additional reliable evidence" giving a police officer reasonable suspicion to conclude that an individual has committed a crime, were unconstitutional. *Id.* The court held that the pat-down searches were unconstitutional because "the stoppings are unconstitutional . . . and . . . the pat-down searches are made without reasonable grounds to believe that the par-

ticular person patted down is armed and dangerous." *Id.* (citations omitted.)

The preliminary injunction enjoined the San Francisco Police Department from "[f]orcibly stopping on the street any person on the ground that such person appears to be within the so-called 'profile' of the suspected 'Zebra' killer unless other independent evidence (such as the conduct of the suspect) known to the officer create a reasonable suspicion that such person had committed or is committing a crime." C.T. at 100. It also enjoined pat-searching and the preparation of field interrogation cards in the absence of similar independent evidence.

On April 26, 1974, after the district court denied their motion for a stay of the injunction pending appeal, defendants filed a notice of appeal to this court. The substantive issue on appeal is whether Operation Zebra violated the Fourth Amendment prohibition against unreasonable searches and seizures. As a threshold matter, however, we must determine whether this issue is moot.

## II.

The Supreme Court has stated that the duty of a federal court "is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895). The inability of federal courts "to review moot cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." *Liner v. Jafco, Inc.,* 375 U.S. 301, 306 n.3, 84 S.Ct. 391, 394, 11 L.Ed.2d 347 (1964). "Simply stated, a case is moot when the issues presented are

---

**3.** The court noted that the April 23 directive to the Zebra Command limiting "the class of persons subject to stop to an individual who 'is acting, or appears to be, out of the ordinary,'" had not been issued to the larger number of ordinary patrol officers, who continued to operate under the prior instructions. C.T. at 92.

no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969).[4]

Two events have raised the possibility that the appeal in the present case is moot. On April 25, 1974, shortly before the issuance of the injunction, the San Francisco Police Department promulgated "Revised Zebra Guidelines" which appellants contend corrected any constitutional infirmities in the earlier directives. Some testimony by Police Chief Scott suggested that, in addition to similarity to the profile and the physical data range, the April 25 directives required officers to have independent evidence of other conduct before they could make an Operation Zebra stop.[5] Appellants argue that this additional requirement gave police officers reasonable suspicion for Fourth Amendment purposes when they stopped citizens. Similarly, during the hearing the court suggested that the revised guidelines of April 25 were more restrictive than the preliminary injunction proposed initially by appellees.[6] This evidence supports the argument that by April 25, 1974, the Police Department voluntarily had remedied any constitutional defects in its behavior, and that, since questions no longer existed about the constitutionality of the Zebra program, the district court issued

---

**4.** The requirement of a "case or controversy" applies to an action for declaratory and injunctive relief, as does the "repetition/evasion" exception to the mootness doctrine, discussed *infra. Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); 28 U.S.C. § 2201.

**5.** Police Chief Scott testified:
"THE COURT: Are you telling us that in addition to the profile and the resemblance of the individual to the profile, that in order to stop now, you are asking the officers to have independent evidence of other conduct?
"THE WITNESS: Yes, sir, I would say that something extra, something else—right." R.T. at 240.
During cross-examination, Scott stated:
"Q. Let me ask you this, Chief. Did you intend by these revised guidelines to do anything new or different in your search for the Zebra killer?
"A. Yes, I would say that my intention would be to probably have the men have a little more substance or reason for making stops in this particular Zebra case. In other words, just as Chief Barca promulgated his order, when we make stops, we want to have a little bit more than just the composite picture, the profile. And I see nothing wrong with it." R.T. at 259.

**6.** During a discussion with the City Attorney, the court stated:
"THE COURT: I have before me the proposed preliminary injunction, I have just read these proposed guidelines. I find that from the point of view of the police and law enforcement, these proposed provisions of the preliminary injunction appear to be even more liberal than the guidelines. The only thing wrong with the guidelines is the fact that they use the word 'Zebra.' Now, just reflect on this proposed preliminary injunction. This proposed preliminary injunction is restricted to forcible stopping, forcibly stopping. Now, don't you think that we could reflect upon this for a moment and we could come to an understanding? Wouldn't the City Attorney be better off if he were to consent to the entry of this particular preliminary injunction, in light of the guidelines that have now been submitted? These guidelines, in my view, constitute a possibly greater encroachment than the preliminary injunction is.
"MR. O'CONNOR: If I may respond, Your Honor?
"THE COURT: I mean, these guidelines constitute a lesser encroachment than the preliminary injunction. I think the guidelines are more liberal and in the greater interest of the people than the preliminary injunction is. The only difference is that this happens to be entitled 'Zebra.' That's the fact that we are confronted with at the moment." R.T. at 262–63.
In a discussion with Deputy City Attorney Agnost about the need for an injunction, the court stated:
"MR. AGNOST: Well, the issue before the Court, Your Honor, is whether or not a preliminary injunction should issue at this time.
"THE COURT: I think it should, in the light of the prior history. I don't think that this is . . .. And it does not reflect on the Police Department if it does, because the Police Department has already agreed, not only to do everything that any injunction of the Court would call for, but they have done so before any order of the Court, and they have gone further than any order of the Court; because they have established and are providing adequate guidelines for not only forcible stopping but for any type of approach situation." R.T. at 265–66.

an injunction in a controversy that had ended.

Even more important, on March 29, 1976, four defendants identified in a State of California Superior Court criminal action as the Zebra killers were convicted and sentenced to lengthy prison terms.[7] No information suggests that the Police Department still is investigating the Zebra murders, or that it is making stops pursuant to Operation Zebra. Under a straightforward application of the case or controversy requirement, the cessation of the mass murders, the termination of Operation Zebra, and the conviction of the Zebra killers appear to have divested the parties of any legally cognizable interest in the constitutional issues engendered by the stops and frisks. Hence, any opinion by this court would seem to be advisory only.

■ The general principles of mootness contain an important exception, however, which we must address before holding that this appeal is moot. In *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), the Supreme Court stated that its jurisdiction "ought not to be, as [it] might be, defeated, by short term orders, capable of repetition, yet evading review . . . ." This doctrine has been used frequently in the last 60 years and applies to court orders and injunctions similar to that involved in the instant case. *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Carroll v. President and Commissioners,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968).

■ The first aspect of the repetition/evasion exception involves a determination of the possibility of repetition of the challenged law or conduct. When events have permanently destroyed any possibility of repetition, the case is moot. *Board of School Commissioners v. Jacobs,* 420 U.S. 128, 129, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975); *DeFunis v. Odegaard,* 416 U.S. 312, 317, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). Similarly, when the chance of repetition is remote

and speculative, there is no jurisdiction. *SEC v. Medical Committee for Human Rights,* 404 U.S. 403, 406, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972); *Hall v. Beals,* 396 U.S. 45, 49, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969). "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *United States v. W. T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). This requirement would not be satisfied "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968).

■ The evasion branch of the test is fulfilled when "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration . . . ." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975). The case should be within a class normally incapable of appellate review because of the lapse of time. *See Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Dunn v. Blumstein,* 405 U.S. 330, 333 n.2, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). In making its decision on evasion, a court examines a variety of factors such as the probability that a subsequent suit challenging the action will be brought and the likelihood that it will reach appellate review. *See DeFunis v. Odegaard, supra,* 416 U.S. at 319, 94 S.Ct. 1704.

■ Applying this doctrine to the present case, we hold that the April 25 revised guidelines did not moot this legal action. Even if they did correct constitutional infirmities in the earlier directives, the April 25 guidelines did not end the controversy or divest the district court of the power to grant an injunction. Between April 17 and April 25, police officials issued at least six directives relating to the Zebra program. On this proven record of almost one new order per day, there was no reason

---

7. *People v. Moore,* No. 88244 (Super.Ct.Cal. 1976).

for the court to conclude that new, and possibly contradictory, pronouncements might not be issued within the next week. In fact, the guidelines themselves suggested that they could be revised easily, and that the police officers could revert to their prior, allegedly unconstitutional, practices. They provided that they could be "modified or disregarded because of special circumstances" upon Chief Scott's authorization, Defendants' Exhibit E at 7, and the court found that "absent an order of this Court to the contrary, they may be modified or revoked at any time." C.T. at 93. Just as important, there still existed questions about whether these revised guidelines even corrected the constitutional problems of the earlier directives. Portions of Scott's testimony suggested that the revised guidelines might permit stops on the same challenged basis as the initial directives. R.T. at 290. The district court, moreover, found that the April 25 guidelines continued to permit stops on no more than a determination that the suspect resembled the composite drawings and other physical characteristics of the Zebra killer.

Although these factors do not demonstrate the unconstitutionality of the April 25 guidelines, they do show that the challenged police behavior was very capable of repetition, either through explicit rejection of the new guidelines or by a continuation of criteria used in making earlier stops. "It is settled that an action for an injunction does not become moot merely because the conduct complained of has terminated, if there is a possibility of recurrence, since otherwise the defendants 'would be free to return to "[their] old ways." ' " *Allee v. Medrano,* 416 U.S. 802, 810–11, 94 S.Ct. 2191, 2198, 40 L.Ed.2d 566 (1974) (citations omitted). The defendants have a heavy burden of showing that they will not revive their challenged conduct, and mere disclaimers are not satisfactory. *United States v. W.T. Grant Co., supra,* 345 U.S. at 633, 73 S.Ct. 894. In the present case, so

many questionable circumstances existed that this burden was not met.

█ Even if the March 29, 1976, convictions ended any chance that Operation Zebra would be used again to apprehend more Zebra killers, they did not destroy the possibility of a recurrence of Zebra-like guidelines involving the same challenged conduct and constitutional questions of *Williams v. Alioto,*[8] Scott testified that, presented with another series of unsolved homicides, "I would probably issue the same order we are talking about now." R.T. at 253. In an effort to show that the Zebra program was not an extraordinary departure from normal procedures, he testified that the Zebra guidelines represented prevailing departmental policy and police behavior, and that "when it comes to matters of law and procedures, would apply to any other case or any other investigation or patrol procedures." R.T. at 255. With the development of techniques ensuring a high degree of accuracy, the use of composite sketches and physical data ranges has become an increasingly familiar aspect of law enforcement efforts, and can be expected to continue.

█ We hold that the convictions and the cessation of the homicides have mooted this appeal, however. A mere speculative possibility of repetition is not sufficient. There must be a cognizable danger, a reasonable expectation, of recurrence for the repetition branch of the mootness exception to be satisfied. We are unable to find this required possibility of repetition. Despite Scott's assurances that the Zebra program represented departmental policy, everyone else involved in the case viewed the program as an extraordinary effort to apprehend a mass murderer. Indeed, the program raised serious constitutional questions justifying an action for declaratory and injunctive relief. The likelihood that such a program will be used in the future is incal-

---

8. The repetition/evasion exception does not require a repetition of the exact law or behavior. The focus is on whether the same issues, arising from a repetition of a similar law or action,

are likely to recur. *See Southern Pacific Terminal Co. v. ICC, supra,* 219 U.S. at 515, 31 S.Ct. 498.

culable. Perhaps if the City were confronted with another series of unsolved homicides that frustrated normal investigative techniques, a large-scale program of stops, frisks, and questioning might reappear. As Chief Scott stated, the Police Department might again use Zebra-like guidelines in a similar situation. But the relevant question is: Is this situation likely to arise? Although we can imagine its recurrence, we cannot consider it more than a speculative possibility.

■■■ The reasonable likelihood that challenged conduct or laws will recur is not enough to fulfill this segment of the repetition/evasion exception. The disputed action must be likely to affect again the litigants in the original lawsuit. In class actions, the repetition need occur as to some of either the named or unnamed plaintiffs. *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). In the present case, even in the remote event that Zebra-like guidelines recurred, it is unlikely that they would burden any of the plaintiffs. Although there are numerous named and unnamed plaintiffs, this number is small as compared to the entire population of San Francisco. It is probable that new guidelines would focus on a new class, such as white males or black females, and thereby make it impossible for the present plaintiffs to be affected by their recurrence.

The Supreme Court has found mootness in factual situations that were equally unlikely to recur. There was mootness in *Hall v. Beals, supra,* 396 U.S. at 49, 90 S.Ct. at 202, where "appellants will face disenfranchisement in Colorado in 1972 only in the unlikely event that they first move out of the State and then re-establish residence there within two months of the presidential election in that year." Similarly, in *Preiser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 233, 45 L.Ed.2d 272 (1975), the Court dismissed a prisoner's action challenging his transfer without hearing or explanation from a medium security prison to a maximum security prison after a showing that he had returned to the medium security prison. The Court found that "[a]ny subjective fear [the plaintiff] might have entertained of being again transferred, under circumstances similar to those alleged in the complaint . . . [is] indeed remote and speculative . . ." *Id.* at 402–03, 95 S.Ct. at 2335.

We have held that a challenge to extraordinary law enforcement actions is moot if the state of emergency has ended, and if both the emergency situation and the allegedly unlawful police actions are extremely unlikely to repeat themselves. In *Halvonik v. Reagan,* 457 F.2d 311 (9th Cir. 1972), the State of California promulgated loitering and assembly regulations in response to several riots and acts of violence that occurred in the City of Berkeley. Order was soon restored, however, and the disputed regulations were rescinded. The court found that a lawsuit challenging the regulations was moot because of the unlikelihood that comparable turmoil and regulations would occur in the City. *Id.* at 313–14. Similarly, in *Wilson v. Webster,* 467 F.2d 1282 (9th Cir. 1972), the termination of several weeks of campus unrest and the revocation of an ordinance designed to deal with the turmoil mooted a suit against county law enforcement officials. The court found that further campus riots were improbable. *See also Taylor v. McGowan,* 412 F.Supp. 1094 (C.D.Cal.1975). These decisions suggest that states of emergency and the responses they trigger do not fit readily into the repetition/evasion exception to the mootness doctrine.

■■■ Although it is not an explicit part of the repetition/evasion test, the significance of the issue plays an intangible role in determining whether this standard is met. Undoubtedly, the public interest is served by a prompt adjudication of significant constitutional issues. "But purely practical considerations have never been thought to be controlling by themselves on the issue of mootness . . . ." *Richardson v. Ramirez,* 418 U.S. 24, 36, 94 S.Ct. 2655, 2662, 41 L.Ed.2d 551 (1974). Concern for the public interest can support the decision to review a case, but it cannot confer jurisdiction. *Sosna v. Iowa, supra,* 419 U.S. at 401 n.9, 95 S.Ct. 553. Whenever the Supreme

Court speaks of the public interest as a factor supporting justiciability, it does so only if a dispassionate application of the mootness doctrine confers jurisdiction. *See Super Tire Engineering Co. v. McCorkle, supra,* 416 U.S. at 125–27, 94 S.Ct. 1694; *United States v. W.T. Grant Co., supra,* 345 U.S. at 632–35, 73 S.Ct. 894. In the present case, we have determined that the Article III requirement of a case or controversy is not satisfied. We are unable to create jurisdiction by resort to public policy considerations.

■■ Both prongs of the repetition/evasion standard must be met in order to avoid mootness. Because the likelihood of repetition is remote and speculative, we need not determine whether the recurrence of Zebra-like guidelines would evade review.

We conclude that this case does not present issues "capable of repetition, yet evading review." Accordingly, we dismiss the appeal as moot and vacate the judgment of the district court. We have no occasion to consider the Fourth Amendment issues raised by the parties.