**UNITED STATES of America, Plaintiff,**

v.

**Charles J. ABBOTT, Defendant.**

**Crim. No. 83–165.**

United States District Court,
W.D. Pennsylvania,
Pittsburgh Division.

April 19, 1984.

Dennis P. Kissane, Robert Perry, Pittsburgh, Pa., for plaintiff.

Paul D. Boas, Berlin, Boas & Issacson, Wayne A. Babcock, James L. Weisman, Weisman & Pass, Pittsburgh, Pa., for defendant.

## OPINION

SIMMONS, District Judge.

In the present criminal action this Court reviews the legality of a warrantless search of a parked automobile by local law enforcement officers.

On August 29, 1983, at approximately 11:00 P.M., two plainclothes police officers, Richard Martine and Robert Harbough, were stopped in an unmarked police car at a red light. In the lane to their immediate left sat an automobile operated by Charles J. Abbott, the defendant. A female pas-

senger, Kimberly Karpiak, was in the automobile with Abbott. In the lane to Abbott's immediate left was a taxi cab. While the vehicles sat at the intersection, Abbott raced the engine of his automobile, squealed the tires and shouted to the taxi driver, "Let's drag!" Officer Martine displayed his badge and told Abbott to keep quiet. Abbott shouted an obscenity in response and sped through the red light. The officers gave chase.

Officer Martine radioed ahead for assistance. During the ensuing chase, the police officers fell several blocks behind Abbott and eventually lost sight of his vehicle. Several minutes later, Martine spotted Abbott's car parked in a narrow alley off 32nd Street. The vehicle was partially protruding into the road, but was not obstructing traffic. No one was in the vehicle. The vehicle's windows were down, the doors closed, the engine off and the keys gone.

While sitting in his cruiser next to Abbott's vehicle, Officer Martine was informed over the police radio that a man and a woman were walking in the vicinity of 32nd Street. Martine left his partner in the alley and proceeded to 32nd Street where Abbott and Karpiak were observed. There he positively identified Abbott and Karpiak as the occupants of the pursued vehicle. Both were placed under arrest. At the arrest scene, $11,000.00 was recovered from Karpiak's purse. Karpiak informed Officer Martine that the money belonged to Abbott.

Officer Martine returned to the automobile in the alley where his partner was waiting. There he decided to impound Abbott's vehicle. Prior to towing, the officers conducted a search of the automobile. They discovered a briefcase in the interior which was immediately opened. Inside the briefcase they found cash and narcotics. The search was abandoned and the officers proceeded to the police station with the briefcase and its contents.

Abbott was charged with several state motor vehicle offenses and with possession and intent to distribute a controlled substance.

Also seized from Abbott's briefcase were certain documents alleged to be evidence of bookmaking. Abbott was charged in state court with violation of the Commonwealth's bookmaking laws. A suppression hearing was held on these charges in the Allegheny Court of Common Pleas. On the same facts before this Court, the Court of Common Pleas ruled that the search of Abbott's automobile was unconstitutional and suppressed the seized evidence. The Commonwealth has since nol-prossed the bookmaking charges against Abbott.

Abbott was later indicted by a federal grand jury upon the evidence seized from his vehicle and charged with possession and intent to distribute a controlled substance in violation of federal law. Abbott filed a suppression motion contending that the warrantless search of his vehicle violated the Fourth Amendment's prohibition against unreasonable searches and seizures. A suppression hearing was held. Abbott's suppression motion is now before this Court for disposition.

The government admits that the police had no search warrant or probable cause to search Abbott's vehicle. Nevertheless, the government advances two justifications for its warrantless search. The government's principal justification is that the search was a routine inventory search and therefore valid. The government's residual argument is that the automobile was abandoned and therefore Abbott had no reasonable expectation of privacy in its contents. Abbott, on the other hand, contends that the search was invalid because the vehicle was not in lawful police custody, the purpose was investigatory and the search was unreasonably broad.[1] Abbott also argues that the government cannot show that he

---

**1.** This Court does not reach Abbott's argument that the police officer's search of the contents of his briefcase exceeded the permissible bounds of a valid inventory search under, *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), because the case is disposed of on other grounds. *Cf. United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), *with, Illinois v. Lafayette,* —— U.S. ——, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983).

intended to relinquish his rights to the automobile and its contents, therefore, the government's abandonment theory must fall.

## I.

The Fourth Amendment to the United States Constitution provides that the people are to be secure against "unreasonable searches and seizures." U.S. Const. amend IV. The Fourth Amendment's core function is to safeguard the privacy and security of individuals from intrusive and arbitrary invasions by government officials. *See, e.g., United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967).

The warrant requirement has traditionally represented an assurance that a search and an arrest not proceed without probable cause. It is generally believed that a finding of probable cause by a neutral and detached magistrate is the best means to secure Fourth Amendment values. For "it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978), *citing, Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnotes omitted).

The Supreme Court has recognized a narrow exception to the warrant requirement for automobile searches. In its decisions on the automobile exception, the Supreme Court has advanced two rationales to justify the warrantless search of an automobile. The first justification is based on exigency due to the mobility of automobiles. *See, e.g., Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971): *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In *Carroll* the Supreme Court, believing that the inherent mobility of a vehicle creates an unacceptably high risk of losing its contents, ruled that an immediate intrusion into the individual's zone of privacy was necessary if police officers are to secure illicit substances. In cases of this class, the Court has held that a warrantless search is reasonable. However, the automobile exception to the warrant requirement in *Carroll* applies only to searches of vehicles that are supported by probable cause. *See United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). Because the government admittedly lacked probable cause to search Abbott's vehicle, this Court need not concern itself with the mobility rationale.

The second justification underlying the automobile exception is the "diminished expectation of privacy" theory. Because of their configuration and use, and because automobiles, unlike homes or offices, are continually subjected to pervasive governmental regulations, the Supreme Court has reasoned that the intrusion of a warrantless search of an automobile is constitutionally less significant than a warrantless search of more private areas. *See Arkansas v. Sanders,* 442 U.S. 753, 761, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979). It is in this light that the Supreme Court has approved, as permissible under the Fourth Amendment, the "community caretaking functions" and the "traffic-control activities" of the routine inventory search. *See South Dakota v. Opperman,* 428 U.S. 364, 368, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976).

The *Opperman* case involved a routine inventory search of an automobile lawfully impounded by the police for municipal parking violations. In the course of an inventory search, police officers opened the glove compartment of Opperman's vehicle and discovered marijuana. Opperman was later convicted on drug related charges. On certiorari, the United States Supreme Court held that the Fourth Amendment permitted limited governmental intrusion into automobiles impounded or otherwise in

lawful police custody where the intrusion is aimed at securing or protecting the car and its contents. *Opperman*, 428 U.S. at 373, 96 S.Ct. at 3099.

Yet, the Supreme Court acknowledges that the search of an automobile is a substantial intrusion upon the owner's rights to privacy in his effects. "The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." *Coolidge v. New Hampshire*, 403 U.S. 443, 461, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564 (1971). In this regard, the *Opperman* Court believed that the nature and substantiality of interest to justify an inventory search of an automobile must be something more than a desire to discover evidence of crime. To this end, the Supreme Court identified three distinct interests which it believed justified an inventory search: "(i) protection of the police from danger; (ii) protection of the police against claims and disputes over lost or stolen property; and (iii) protection of the owner's property while it remains in police custody." *Opperman*, 428 U.S. at 378, 96 S.Ct. at 3101 (Powell, J., concurring).

Weighing these varying societal and governmental interests advanced to justify such an intrusion against the constitutionally protected interest of the individual citizen in the privacy of his effects, the *Opperman* Court reasoned that, on balance, the Constitution permits routine inventory searches.

Pivotal to the Court's analysis in *Opperman* was the "benign purpose" of a routine inventory search. Inventory searches are not conducted to discover evidence of crime, so in the Supreme Court's view, there is no significant danger of compromising the individual's legitimate expectation of privacy. This is especially true when a protective inventory search is carried out in accordance with standard procedures in the local police departments, a factor which tends "to ensure that the in-

trusion [will] be limited in scope to the extent necessary to carry out the caretaking function." *Opperman*, 428 U.S. at 374–75, 96 S.Ct. at 3100.

Investigatory searches, on the other hand, are clearly distinguishable. In the criminal investigatory context, a warrant may issue only upon probable cause. So it is the warrant requirement that protects the individual's legitimate expectation of privacy against the overzealous police officer. This is accomplished through an independent examination of the facts by "a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) (footnote omitted). These concerns are not present in the inventory search, given its benign noncriminal context; hence, the warrant requirement is inapplicable. *See Opperman*, 428 U.S. at 370 n. 5, 96 S.Ct. at 3097 n. 5.

In this case, Abbott asserts that the police officers' search of his vehicle was motivated by a desire to discover evidence of crime. Abbott contends that the inventory search was a mere pretext concealing an investigatory police motive. In short, Abbott argues that to the extent the police officers' so-called inventory search was coupled with a desire to ferret out crime, the "diminished expectation of privacy" justification for a warrantless search is lost. This is because the desire to discover evidence must be based on probable cause; an investigatory search is otherwise impermissible and its fruits must be suppressed. This Court agrees.[2]

## II.

On the record in this case there was no probable cause to search Abbott's vehicle, no search warrant was sought nor would one have issued. This much the government admits. The government contends,

---

2. A different situation would be present had the search of Abbott's car been incident to and contemporaneous with a lawful custodial arrest, which clearly are not the facts of this case. *See,*

*New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

however, that the search was reasonable under Fourth Amendment standards because it was a purely, routine inventory search of Abbott's vehicle as sanctioned by the *Opperman* Court.

What the Supreme Court held as reasonable in *Opperman* were searches of (i) automobiles impounded or otherwise in lawful police custody, (ii) conducted pursuant to standard police inventory procedures, (iii) where the process is aimed at securing the car and its contents. *Opperman,* 428 U.S. at 373–74, 96 S.Ct. at 3099. *Opperman* thereby imposes a three-prong standard upon the government to establish a bona fide inventory search. The government must demonstrate that Abbott's vehicle was in lawful police custody prior to its search; that the search was routine and conducted pursuant to standard police procedures following the guidelines laid down in *Opperman;* and that the search was conducted solely for the purpose of securing and inventorying the automobile's contents, and not for the purpose of gathering incriminating evidence against the owner. If the record in this case shows that the procedures followed by Pittsburgh's police officers in searching Abbott's vehicle fell short of these standards, the search was impermissible and its fruits must be suppressed.

From an analytical standpoint, it should be noted at the outset, the "motive" prong of the *Opperman* standard subsumes the "lawful custody" and "standard procedure" prongs. Motive is the sole factor which distinguishes the criminal investigatory search from the noncriminal inventory search of an automobile. Because motive is a subjective cause that induces action, it is often difficult to objectively ascertain. Therefore, we look to other, more objective standards to infer the drive that moves one to action. These objective criteria, while not always conclusive, are probative and reliable evidence of motive.

In the context of an automobile search, whether the vehicle is in lawful police custody and whether the officer inventoried pursuant to standard procedures are merely circumstantial evidence of the existence of an improper investigatory motive. An officer's mere technical violation of local inventory procedures may not invalidate an otherwise bona fide inventory search. However, a questionable impoundment coupled with a failure to follow standard procedures raises an inference of improper motivation. This is not because a lawful impoundment will save an otherwise impermissible search or the reverse; but because the lawfulness of the impoundment may help the Court to interpret facts and infer motive.

### A.

First, Abbott contends that the police officers' search of his automobile was not a valid inventory search because the vehicle was not in lawful police custody. The sole justification for the officers' warrantless incursion is that it was essential to the caretaking function to protect the owner's property while in lawful police custody. Disabled automobiles, following vehicular accidents of mechanical failure, are frequently taken into lawful police custody. Likewise, automobiles which violate local parking ordinances are lawfully impounded. *See Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). In *Opperman,* the Supreme Court noted that the "authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Opperman* 428 U.S. at 369, 96 S.Ct. at 3097.

The "Pittsburgh Department of Police Procedural Order" Number 145–1 provides for the towing of vehicles not considered abandoned in the following circumstances: recovered stolen vehicles; vehicles involved in accidents; vehicles of arrested persons; and for parking violations. In this case, the "Towing Notice" completed by Officer Martine states that Abbott's vehicle was

impounded because of the "Arrest of Driver."[3]

Procedural Order Number 145-1 limits the towing of an arrestee's vehicle to clearly defined circumstances. Officer Martine contends that Abbott's car was towed because it created a traffic hazard. Abbott disagrees and stringently argues that the officers lacked sufficient cause to impound his car.

The evidence is in dispute as to whether Abbott's vehicle presented a traffic hazard. Abbott makes much of Officer Martine's concession that other vehicles could pass Abbott's car without difficulty and that the car was parked in an infrequently used alley. The fact remains, however, that Abbott's vehicle was partially protruding into the road. This fact alone may justify the towing. Judges are not in a position to second-guess a police officer's decision to tow a vehicle which, in the officer's opinion, may create a traffic hazard. To do so would seriously handicap legitimate traffic-control activities.

The inquiry into motive, however, does not stop at a finding that Abbott's vehicle was in lawful police custody. For the facts and circumstances surrounding a lawful impoundment can still lead to the conclusion that an inventory search was motivated by an improper purpose.

The Procedural Order which authorizes towing an arrestee's vehicle proscribes impoundment unless its conditions are met. Order Number 145-1 provides that a vehicle "shall NOT be towed unless" it "presents a traffic hazard and cannot be moved." (emphasis in original). It also provides that the arrestee may give his permission for another to move his car. The tenor of Order Number 145-1 indicates

a departmental preference against impoundment of an arrestee's vehicle.

Officer Martine testified that Abbott's vehicle was parked mostly on private property, but partially protruding into the road. The keys were gone, but the windows were down. However, there is no evidence to suggest that the vehicle could not have been moved, short of impoundment, or that the officers attempted to do so. Nor does the record indicate that the officers sought Abbott's permission to have someone move his car.

The anticipated length of Abbott's detainment is also relevant. It is especially true in this case because Abbott was likely to be detained for only a brief period, since he was arrested for traffic violations. Although Abbott's vehicle was parked at the time of his arrest, this situation is clearly different from that in *Opperman* where "[t]he owner, having left his car illegally parked for an extended period, and thus subject to impoundment, was not present to make other arrangements for the safekeeping of his belongings." *Opperman*, 428 U.S. at 375, 96 S.Ct. at 3100. In the context of a typical inventory search, "[t]he owner . . . is not present, nor, in many cases, is there any real likelihood that he could be located within a reasonable period of time." *Id.* at 384, 96 S.Ct. at 3104.

■ Logically, since an inventory search is to protect the owner's property, the owner, whenever available, should be given the opportunity to determine how he wants his property secured. The Supreme Court has implicitly embraced the view:

that it should only be in the atypical case that police officers would find it necessary to conduct a general inventory search of an impounded vehicle. The

---

3. Procedural Order Number 145-1 provides, in part, that an arrestee's vehicle shall be towed according to the following procedures:

4.00 VEHICLES OF ARRESTED PERSONS
.01 Vehicles of arrested persons shall NOT be towed unless:
    a) The vehicle presents a traffic hazard and cannot be moved.
    b) Requested by the Investigation Branch for investigative or evidential purposes.

.02 The arrested person may give his permission to another person to move his vehicle.

This Court need not consider subsection (b) because an investigative purpose must be predicated on a warrant which can only be supported by probable cause and the government in this case contends that the search of Abbott's car was noninvestigatory.

owner of the property may be able to take reasonable steps to safeguard his property at the time of arrest, thus obviating the necessity of impoundment .... [I]t is only reasonable that the owner be allowed to choose whether or not he wishes his car impounded. In cases where the owner or operator cannot make his wishes known ... the property would be adequately safeguarded by rolling up the windows and locking the doors, subject, of course, to reasonable steps to safeguard property in plain view within the automobile.

*United States v. Lawson,* 487 F.2d 468, 477 (8th Cir.1973); *accord, Opperman,* 428 U.S. at 375, 96 S.Ct. at 3100.

■ The facts and circumstances surrounding Abbott's arrest reasonably suggest that the police officers should have secured Abbott's vehicle by means other than impoundment. While there is no affirmative requirement that they have done so, their failure to do so raises the inference that the impoundment was pretextual.

### B.

■ The second objective criterion helpful in ascertaining motive is whether the inventory was conducted pursuant to established police department rules or policy. The normalcy of a standard procedure is the only assurance that an inventory search will be limited in scope to the extent necessary to perform the caretaking functions. *See Opperman* 428 U.S. at 374–75, 96 S.Ct. at 3099–3100.

When Officer Martine impounded Abbott's car he completed a Towing Notice form. The standard Towing Notice form contains a "remarks" section for articles found in a towed vehicle. Procedural Order Number 145–3 provides that police officers towing vehicles shall complete the Towing Notice in its entirety, giving special attention to the "remarks" section.[4] In the remarks section, on Abbott's Towing Notice, Officer Martine noted that a briefcase and an unknown amount of money were seized from Abbott's car.

Several days after the towing, Officer Martine prepared a memorandum, on Pittsburgh Police Department stationery, itemizing the articles found in Abbott's briefcase. At that time, Martine listed several items which were not mentioned on the Towing Notice form, to wit: two checkbooks, a leather wallet with identification cards, several credit cards, a vehicle registration card, delinquent tax notices, an Agreement of Sale for real estate, and various business documents. To this inventory, Martine attached a "Property Record" form. The Property Record form contains a section for indicating the status of custodial property. In the status section Martine checked the box marked "EVIDENCE."

A few days later, another officer inventoried the contents of Abbott's vehicle. A standard "Evidence and Property Record" form was used. In the custodial status section, the "PROPERTY" box was checked; the "EVIDENCE" box was left unchecked. Attached to the Evidence and Property Record form was a list of the items found in Abbott's car. The itemization indicated the various compartments in Abbott's car from which items were seized. The inventory listed approximately forty-

---

**4.** The Pittsburgh Department of Police Procedural Order Number 145–3 provides as follows:
POLICY OR PURPOSE
1.01 Police officers having a vehicle towed have a responsibility as part of their duties to protect an owners property and themselves against liability by completing the Towing Notice in a proper manner and, in the event of making an improper or incomplete Towing Notice, have a responsibility to share in any claim that may be made against the City as a result of this improper or incomplete towing notice.

PROCEDURE
2.00 PROPER COMPLETION OF THE TOWING NOTICE
.01 Police officers having a vehicle towed shall complete the Towing Notice in its entirety and in accordance with the instructions contained thereon.

. . . .

.05 Special attention shall be given to the remarks section where any other items not listed on this form shall be entered.

five items, excluding the briefcase and its contents. Among the items inventoried were a nylon windbreaker jacket, two traffic citations, several stereo tapes, a hat, an inscribed wooden plaque, a no-fault insurance card, a leather pouch, a Craftsman wrench and various other items.

The government contends that, in conducting the search of Abbott's car, Officer Martine followed established departmental procedures for inventorying an arrestee's vehicle. The facts belie the government's claim. The evidence in this case overwhelmingly establishes that Officer Martine failed to follow standard departmental procedures. In the remarks section of Abbott's Towing Notice Martine listed a briefcase and an unknown amount of money as the *only articles found in Abbott's car*. A subsequent inventory, however, revealed that at least forty-five separate items were in Abbott's vehicle. Explaining the discrepancy, Martine asserted that he must not have considered the other items to be valuable. To be sure, several items in Abbott's car were of nominal value. Arguably, others were valuable, if not to the officer, certainly to the owner. But value, *vel non*, is not relevant to the determination of whether the search was proper, because a bona fide inventory search removes this sort of discretion from the officer's province.

In a proper inventory search, the officer does not make a discretionary determination to search based on his judgment that certain conditions are present or to seize certain items. Inventory searches are conducted to secure the owner's property in accordance with established police department rules or policy. The fact that "no significant discretion is placed in the hands of the individual officer," who "has no choice as to the subject of the search or its scope," was central to the Supreme Court's holding in *Opperman*, 428 U.S. at 383–84, n. 11, 96 S.Ct. at 3104–05 n. 11, that inventory searches are permissible.

Moreover, Officer Martine's inventory of Abbott's briefcase was completed on departmental stationery, not on a standard inventory form. Attached thereto, was a standard Property Form. On the Property Form Martine listed the inventoried items as "EVIDENCE." The procedures Officer Martine followed stand in stark contrast to those followed by the officer who subsequently inventoried Abbott's car. That officer used a standard Evidence and Property Record form; listed the status of the seizures as "PROPERTY," not "EVIDENCE;" and discovered forty-five additional articles which were itemized by the various compartments from which the articles were seized.

The scenario painted by the facts and circumstances of this case suggest that Martine's search of Abbott's car was conducted to discover evidence of crime, not to secure its contents. Officer Martine, an experienced narcotics agent, admitted that he suspected that Abbott's car contained contraband. When Martine initially searched Abbott's car, no list of its contents was prepared. When Martine finally inventoried Abbott's briefcase he listed the items as "EVIDENCE," not custodial "PROPERTY." Martine never prepared an inventory of Abbott's car. In sum, Martine's conduct is logically consistent with only an investigative intent.

An automobile search motivated by a desire to ferret out crime is only justified if based upon probable cause or exigent circumstances. Since both were absent in this case, the search of Abbott's car is valid only if conducted to secure its contents. On the facts and circumstances of this case, Officer Martine took no protective measures to secure the automobile's contents. Nor did he follow established departmental procedures for inventorying an arrestee's vehicle. Under the totality of the circumstances, Martine's conduct evinces a purely investigative police motive and the inventory search was a mere pretext concealing that investigatory intent. As such, this Court holds that the search was constitutionally impermissible and its fruits must be suppressed because the desire to discover evidence of crime, no matter how remote, must be based exclusively upon

probable cause reasonably arising out of circumstances known to the officers that Abbott's vehicle contained contraband.

## III.

As an additional justification for its warrantless search of Abbott's vehicle, the government contends that Abbott abandoned his car and, therefore, had no reasonable expectation of privacy in its contents. Abbott argues that the abandonment doctrine does not apply to the facts of this case because there was no unambiguous act of intentional discard on his part, as in *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960).

The defendant in the *Abel* case was convicted for conspiracy to commit to espionage. At his trial several items seized from his hotel room were admitted into evidence. Two of the items were discovered by F.B.I. agents in the course of a warrantless search of Abel's room after he had paid his hotel bill and vacated the room. The hotel gave its consent and the agents searched the room. The incriminating items were discovered in a wastepaper basket. Although warrantless, the government made no pretense that the search was for any purpose other than to gather evidence of crime.

The Supreme Court upheld the search ruling that "[t]here can be nothing unlawful in the Government's appropriation of such abandoned property." *Abel*, 362 U.S. at 241, 80 S.Ct. at 698. In short, the Court reasoned, Abel "had abandoned these articles. He had thrown them away." *Id.*

In the case *sub judice*, the government argues that following *Abel*, courts have consistently held property to be abandoned where a defendant, after being lawfully pursued, throws away or discards property. *See, e.g., United States v. Walton*, 538 F.2d 1348, 1354 (8th Cir.), *cert. denied*, 429 U.S. 1025 (1976); *United States v. Edwards*, 441 F.2d 749 (5th Cir.1971); *United States v. Martin*, 386 F.2d 213, 215 (3d Cir.1967), *cert. denied*, 393 U.S. 862, 89 S.Ct. 142, 21 L.Ed.2d 130 (1968). However, Abbott's conduct is dissimilar to the defendant who, finding himself pursued, left his automobile in the street with the lights on and the motor running and fled on foot, or the defendant who throws contraband through the window of his automobile to escape detection. These cases are factually inapposite and offer little guidance beyond stating the applicable principle of law.

■ Whether there is an "abandonment depends largely on the possessor's intent, and the party relying on it must establish the necessary state of mind by clear and unequivocal evidence." *United States v. Moody*, 485 F.2d 531, 534 (3d Cir.1973) (citations omitted). The Second Circuit has defined the abandonment of property as "the relinquishing of all title, possession or claim to or of it—a virtual throwing away of it. It is not presumed. Proof supporting it must be direct or affirmative or reasonably beget the exclusive inference of throwing away." *See United States v. Cowan*, 396 F.2d 83, 87 (2d Cir.1968).

■ In light of the narrow facts of the *Abel* decision, this Court agrees with Abbott that the government has not met its burden on the issue of abandonment. On the record before this Court, Abbott did not manifest the requisite intent to abandon his car. Nor has the government shown by clear and unequivocal evidence that he intended to do so. When the police officers discovered Abbott's vehicle it was parked on a private lot, the engine was off, the doors were closed and the keys were gone. The fact that Abbott's vehicle was improperly parked or that it was earlier involved in a chase, does not, *ipso facto*, give rise to an inference that Abbott had thrown the car away. To hold so would create a dangerous precedent. An officer who sees an interesting package in an improperly parked automobile may consider it abandoned to obtain justification for a search of the package. Thus, the intent to relinquish one's expectation of privacy in his effects must rest on a more substantial basis.

In addition, the record is devoid of evidence that Abbott's vehicle was objectively identified, e.g. by distinctive markings or a

license number, as the vehicle pursued. Proper identification is important in cases of this nature, because the intent to abandon is inferred "from words spoken, acts done and other objective facts." *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir.1973) (en banc). Where the defendant, having been pursued, is observed discarding contraband it is proper to infer that the intent to abandon is present. But, as in this case, where the supposed abandoned vehicle is parked, and is not objectively identified as having previously been pursued, the intent to abandon is attenuated. This is because the nexus between the vehicle and the conduct which infers intent has not been objectively drawn. The unacceptably high probability of mistaken identity best illustrates the importance of this concern.

Finally, the application of the abandonment doctrine is especially tenuous in this case because the arresting officers did not consider Abbott's car to be abandoned. Under the police department's Procedural Order Number 145–2, vehicles to be considered abandoned are specifically defined.[5] In addition, that Order specifies that no vehicle shall be towed unless a "Notice of Abandoned Vehicle" form is completed and the abandoned vehicle is reported. In this case, Officer Martine did not follow the procedures for towing an abandoned vehicle, nor did he complete the required forms. More importantly, Abbott's car did not fall within the police department's definition of an abandoned vehicle.

On the facts of this case, the government has not met its burden of demonstrating Abbott's clear and unequivocal intent to abandon his car. Clearly, Abbott did not throw his car away; nor did the arresting officer believe that he had. Under these circumstances there was no basis for the government's warrantless search of Abbott's vehicle.

## IV.

In passing, this Court registers its deep concern with the police officers' conduct in this case. The case before this Court does not present the type of egregious facts typically associated with society's notion of official lawlessness. But this case presents the most appealing scenario for criticism of the exclusionary rule and the judiciary for its application. For this reason, the conduct of the city's law enforcement officers and the application of the exclusionary rule merits comment.

When reliable and often the most probative evidence bearing on the guilt or innocence of an accused is excluded from trial, society is outraged, and properly so. Understandably, the public is alarmed at the dreadful impact that crime is having on our society, and it is no wonder that people are infuriated at the erroneous notion that the exclusionary rule sets criminals free because the constable has blundered.[6]

Notably, the purpose of the Fourth Amendment is not to protect a handful of drug dealers or let ruthless criminals escape punishment. Nor are courts in the business of getting criminals on the streets

---

5. Procedural Order Number 145–2 provides that vehicles shall be considered abandoned and towed in accordance with the following definition:

    2.00  ABANDONED VEHICLE DEFINED
    .01  A vehicle (other than a pedalcycle)
      i) that is inoperable and left unattended on the public property for more than 48 hours.
      ii) that has remained illegally on public property for a period of more than 48 hours.
      iii) without a valid registration plate or certificate of inspection or title left unattended on or along the highway or;
      iv) that has remained on private property without consent of the owner or person in control of the property for 48 hours.

6. Contrary to Justice Cardozo's admonition, the exclusionary rule does not result in freeing hordes of guilty criminals "because the constable has blundered." Studies on the impact of the exclusionary rule tend to show that such present day claims are largely exaggerated. In fact, very few criminals walk the streets because of the rule. In 1979, the Comptroller General reported that evidence is excluded from trials in only 1.3 percent of cases as a result of the Fourth Amendment. *See* Report of the Comptroller General, *Impact of the Exclusionary Rule on Federal Criminal Prosecutions,* (April 19, 1979).

as fast as they can. The foremost purpose of the Fourth Amendment is to protect the privacy of all citizens; particularly law abiding citizens who would be otherwise subject to the unbridled seizure of their persons or invasions of their homes, not because the constable has blundered, but because he is overzealously searching for a criminal or evidence of crime, or in some cases, intentionally using his immense power in a vindictive or oppressive manner for personal and unlawful reasons. It is this unfettered discretion the Fourth Amendment prohibits and the law abiding citizen it seeks to protect.

The exclusionary rule is presently the only viable remedy to deter Fourth Amendment violations by suppressing its fruits and denying the government the benefits of its illegal conduct. The rule works in the best interest of the criminal justice system, the law enforcement community and for every American citizen. However, the rule is open to criticism because its values are abstract while the price for its enforcement is obvious. It excludes hard evidence from trial—usually the fruits and instrumentalities of crime. It appears to the layman to reward the undeserving criminal through legal "technicalities."

We should never forget, however, that the Fourth Amendment extends to protect the innocent and the guilty alike. The values protected under the Fourth Amendment are precious; lest we forget that the right to be secure in our homes and possessions is not a right exclusively to those who break the law. *See Weeks v. United States*, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914). It is the potential innocent victim of an illegal search and seizure that the Fourth Amendment seeks most vigilantly to protect:

> It is easy to salute the liberties of the Bill of Rights in the abstract. But these freedoms have a price. It is difficult to remember, but we must never forget, that we cannot apply them selectively. Only insofar as we permit their effective exercise by the guilty will they remain strong protection for the innocent.

Rights atrophy with disuse. They must not only be used in times of calm, but in times of passion and fear as well.

*Exclusionary Rule Bills: Hearing on S.101, S.751 and S.1955 Before the Subcomm. on Criminal Law of the Senate Comm. on the Judiciary*, 95th Cong., 1st Sess. 47 (1981) (testimony of Stephen H. Sachs, Attorney General of Maryland).

Absent the protection of the exclusionary rule, violations of the Fourth Amendment would abound. *See, e.g., Williams v. Alioto*, 549 F.2d 136 (9th Cir.1977) (suit filed to stop police department's frisking of thousands of innocent citizens who met description of so-called Zebra killer in San Francisco); *Lankford v. Gelston*, 364 F.2d 197 (4th Cir.1966) (injunction sought after Baltimore police invaded 300 private homes based on an unverified anonymous tip). Without the incentive of the exclusionary rule, which encourages law enforcement officials to obey the law, coerced confessions, dragnet arrests and frisks and indiscriminate break-ins of private homes would be far more frequent occurrences.

It is for these reasons that our system of jurisprudence mandates vigilant protection of the sanctity of a man's home and his privacies of life. The Fourth Amendment requires it. The exclusionary rule simply seeks to "encourage those who formulate law enforcement policies, and the officers who implement them, to incorporate Fourth Amendment ideals into their [work-a-day] value system." *Stone v. Powell*, 428 U.S. 465, 492, 96 S.Ct. 3037, 3051, 49 L.Ed.2d 1067 (1976). So too, constitutional protection of civil liberties is seriously stymied when the law enforcement community turns a deaf ear to court decisions delimiting the sphere of lawful police conduct. Police officers are not required to observe all of the fine distinctions drawn by men learned in the law. Society, however, rightfully expects that the "cop on-the-beat" will acquaint himself with the common and important provisions of law and operate within their bounds. On this point this case is particularly instructive.

454

The exclusionary rule makes no distinction between egregious violations of the Fourth Amendment and those occasioned through mistake. It excludes from trial all evidence illegally obtained. The case now before this Court is not one of mistake; nor do the facts, on their face, shock the conscience of the Court. But the patently pretextual nature of the supposed inventory search in this case raises a far weightier concern. Simply, the facts here demonstrate a reckless disregard for the most fundamental rights cherished by a freedom-loving society—the right to be free from intrusive and arbitrary invasions of privacy. Moreover, the wrong committed is pointedly exacerbated when the offending officer seeks to cover his tracks through subsequent words and conduct.

It is enough to say that this form of police conduct should find no sanction in the law enforcement community. This admonition applies equally to those who formulate policy as well as those who carry it out. The conduct of the City's police officers, in this case, is wholly repugnant to our founding father's concept of law and order. Moreover, official lawlessness will engender numerous adverse consequences to society which far outweigh any benefits obtained. When the "cop on-the-beat" ignores the law and violates the citizens' rights to privacy, it calls into question the integrity of the individual officer; diminishes public respect for the law enforcement community; erodes public confidence in the criminal justice system; undermines the deterrent effect of the exclusionary rule; and adds countless hours to adjudication of criminal offenses at a time when the judicial system is straining under the burden of costly and time-consuming litigation. In sum, the end can never justify the means.

The motion to suppress is granted. An appropriate order follows.